# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | | |
|---|---|---|---|
| **FREDDIE BLEVINS,** | ) | | |
| Plaintiff | ) | | |
| | ) | | |
| v. | ) | Civil Action No. 1:05cv00087 | |
| | ) | **MEMORANDUM OPINION** | |
| | ) | | |
| | ) | | |
| **JO ANNE B. BARNHART,** | ) | | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT | |
| Defendant | ) | United States Magistrate Judge | |

In this social security case, I vacate the final decision of the Commissioner denying benefits.


*I. Background and Standard of Review*


Plaintiff, Freddie Blevins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2006).   Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

Case 1:05-cv-00087-PMS   Document 17   Filed 06/27/06   Page 1 of 20   Pageid#: 49

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Blevins filed his applications for SSI and DIB on or about June 16, 2003, alleging disability as of May 1, 2002, based on a herniated disc that required surgery, degenerative disc disease, pain in both legs, a limited ability to climb, lift items, stand for long period of time, hold items,[1] to learn new things and to read and write. (Record, ("R."), at 62-64, 71-72, 101, 237-40.) The claim was denied both initially and on reconsideration. (R. at 38-40, 47-49, 243-45.) Blevins then requested a hearing before an ALJ. (R. at 50.) The ALJ held a hearing on May 5, 2005, at which Blevins was represented by counsel. (R. at 249-306.)

By decision dated June 13, 2005, the ALJ denied Blevins's claims. (R. at 23-33.) The ALJ found that Blevins met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 32.) The ALJ found that Blevins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 32.) The ALJ found that the medical evidence established that

---

[1]This word was illegible in the transcript. (R. at 101.)

Case 1:05-cv-00087-PMS   Document 17   Filed 06/27/06   Page 2 of 20   Pageid#: 50

Blevins had severe impairments, namely a back disorder, type II diabetes mellitus and borderline intellectual functioning, but found that Blevins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32.) The ALJ further found that Blevins's allegations regarding his limitations were not totally credible. (R. at 32.) The ALJ found that Blevins had the residual functional capacity to perform light work[2] involving only simple repetitive tasks and with no significant contact with the public. (R. at 30, 32.) Thus, the ALJ found that Blevins could not perform any of his past relevant work. (R. at 32.) Based on Blevins's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Blevins could perform jobs existing in significant numbers in the national economy, including those of a janitor, a machine feeder, an assembler, a gate guard and a hand packer. (R. at 32.) Therefore, the ALJ found that Blevins was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 32-33.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his opinion, Blevins pursued his administrative appeals, (R. at 19), but the Appeals Council denied his request for review. (R. at 15-18.) Blevins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Blevins's motion for summary judgment filed March 16, 2006, and the Commissioner's motion for summary

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§404.1567(b), 416.967(b) (2005).

Case 1:05-cv-00087-PMS   Document 17   Filed 06/27/06   Page 3 of 20   Pageid#: 51

judgment filed April 17, 2006.

## II. Facts

Blevins was born in 1958, (R. at 62, 237), which classifies him as a " younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Blevins has a seventh-grade education[3] with special education in reading and writing. (R. at 77, 256, 264, 286-88.) Blevins has past work experience as a construction worker, a concrete worker, a drywall hanger, a roofer and a carpenter. (R. at 72-73, 81-88, 257-59, 292-96.)

At his May 5, 2005, hearing, Blevins testified that he had constant back pain, diabetes and lesser ability to read than an eighth grader. (R. at 256, 259-64, 286-88.) Blevins stated that he attended some post-operative rehabilitation after his second back surgery, and he was prescribed Motrin, Flexeril and diabetes medicine. (R. at 261-63, 266, 269-70, 285.) Blevins testified that he could lift and carry a 24-pack of soft drinks or beer for a short distance. (R. at 265.) He further testified that he was able to stand for a couple of hours and walk for a quarter-mile before he experienced back pain. (R. at 265, 269, 277-78.) Blevins claimed that he had a diminished ability to sit, to kneel, to bend, to squat, to push and to pull. (R. at 266-67.) He also stated that he was able to reach items over his head, open jars, open doors, dress himself and climb a flight of stairs. (R. at 267-68.) Blevins further testified that he was not able to read a TV Guide, but was able to read a restaurant menu and the Trading Journal. (R. at 270-71, 287-88.) He testified that he held a driver's license,[4] with no

___

[3]Although Blevins reported in his Disability Report that he completed the eighth grade, when questioned at his hearing, he stated that the last grade he completed was the seventh grade. (R. at 77, 286.)

[4]Blevins testified he took an oral driver's license test. (R. at 268.)

-4-

restrictions. (R. at 268.)  Blevins further testified that he could engage in minor household activities, he fed 28 chickens each day, he fed three dogs each day, he hunted and occasionally visited with family and friends. (R. at 271, 273-76, 284.)

Jean Hambrick, a vocational expert, also was present and testified at Blevins's hearing. (R. at 291-304.)  Hambrick classified Blevins's past relevant work as a roofer and as a rough carpenter as heavy[5] and semi-skilled. (R. at 292-96.)  Hambrick classified Blevins's past work as a dry wall hanger, as testified to by Blevins, as medium[6] to heavy and semi-skilled. (R. at 292-94.)  Hambrick classified Blevins's past work as a concrete finisher as heavy and skilled. (R. at 292-94.)  Hambrick testified that the combination of Blevins's construction experience would be transferable to a light job as an estimator.[7] (R. at 295-96.)  Hambrick was asked to consider a hypothetical individual of Blevins's age, education and work experience, who had limited reading and writing abilities and who could perform light work with restrictions on bending, squatting, walking, standing, sitting, pushing and pulling. (R. at 296-97.)  Hambrick testified that such an individual would not be able to perform any of the work Blevins had previously performed. (R. at 297.)  However, Hambrick testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of an assembler, a janitor, a light cleaner, a

---

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2005).

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

[7]Hambrick testified that Blevins's reading and writing capabilities would interfere with his ability to do an estimator job. (R. at 297.)

Case 1:05-cv-00087-PMS   Document 17   Filed 06/27/06   Page 5 of 20   Pageid#: 53

machine feeder/operator, a light hand packer, a gate guard and a security guard. (R. at 297-99.)  Hambrick was then asked to assume the same facts as the first hypothetical plus the restrictions of standing for two continuous hours, an ability to complete simple one-, two- or three-step tasks and holding an eighth-grade education with a lesser level of reading. (R. at 299-300.)  Hambrick testified that such an individual could perform the jobs previously listed. (R. at 300.)  Hambrick was next asked to consider the same facts as the second hypothetical plus the addition of a mild to moderate level of pain that did not interfere with concentration, persistence and pace. (R. at 300.)  Hambrick testified that such an individual could perform the jobs previously listed. (R. at 300.) However, Hambrick testified that if an individual experienced pain that significantly affected his concentration, persistence or pace, he would not be able to perform the jobs previously listed. (R. at 301.)

In rendering his decision, the ALJ reviewed records from Carilion Family Medicine; Dr. Laurence Kleiner, M.D.; Bluefield Regional Medical Center; Community Radiology; Dr. Ram P. Bhasin, M.D.; Carilion Roanoke Memorial Hospital; Melinda Wyatt, M.S., a licensed psychologist; Dr. Edgar Weaver Jr., M.D.; Howard Leizer, Ph.D., a state agency psychologist; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; and William A. Brezinski, M.A., a licensed psychologist.

From September 15, 1995, through September 5, 1996, Blevins saw Dr. Laurence Kleiner, M.D., complaining of back pain, leg pain and muscle spasms in his buttocks, right thigh, calf, ankle and toes. (R. at 115-47.)  Over this time period, Dr.

-6-

Kleiner diagnosed Blevins with a herniated disc and degenerative disc disease with a mild bulge, but no epidural compressive elements. (R. at 141-42, 144-45.) On October 13, 1995, Blevins underwent a right L-5 hemilaminotomy diskectomy at the L5-S1 level. (R. at 139-40.) Thereafter, Blevins underwent physical therapy. (R. at 124-36.) On August 9, 1996, Sherri D. Hankins, an exercise physiologist, and Michael LaMothe, a physical therapist, completed a functional capacity evaluation finding that Blevins could perform light to medium work. (R. at 116-23.) Dr. Kleiner completed a Disability Certificate stating that Blevins could return to full-time work with a 50 pound weight lifting restriction. (R. at 115.)

On May 12, 2003, Blevins complained of back problems to Bluefield Regional Medical Center. (R. at 148-49.) Blevins was diagnosed with chronic back pain. (R. at 148.) Blevins was treated with Nubain and Vistaril. (R. at 148.) Blevins was told to take Flexeril and Motrin and to apply heat and ice to his back. (R. at 148-49.)

On May 19, 2003, Blevins underwent a cervical MRI and a lumbar MRI with and without contrast at Community Radiology. (R. at 150-51.) Blevins was diagnosed with a mild straightening of the normal cervical lordosis with no other abnormalities in the cervical MRI. (R. at 150.) The lumbar MRI showed a focal right bulge and edema at the L4-5 level, a herniated disc fragment and a mild right epidural fibrosis. (R. at 150-51.) On August 18, 2003, Dr. Ram P. Bahasin, M.D., reviewed the results of the MRI and recommended surgery on Blevins's back. (R. at 152.)

From July 3, 2003, to April 29, 2004, Blevins saw Dr. Edgar N. Weaver Jr., M.D., for pain, numbness, tingling in the back of his legs and back pain. (R. at 167-71,

-7-

233-36.) On July 3, 2003, Dr. Weaver diagnosed Blevins with a recurrent disc at the L5 level on the right and some lateral recess stenosis on the left. (R. at 168.) Dr. Weaver recommended a bilateral decompression at the L5-S1 level with diskectomy on both sides. (R. at 168.) On September 24, 2003, Blevins underwent a bilateral partial hemilaminectomy and medial facetectomy and foraminotomy at the L5-S1 level at Carilion Roanoke Memorial Hospital. (R. at 153-54.) On October 30, 2003, Dr. Weaver noted that Blevins has done very well after surgery, but still had fairly significant mechanical signs in reference to his lower back that should improve over time. (R. at 167.) On February 26, 2004, Dr. Weaver noted that Blevins was doing well, but he complained of pinching-like pain in his lower back. (R. at 234.) Dr. Weaver stated that Blevins may be a candidate for a fusion, and that he could return to work February 1, 2004, or earlier. (R. at 234.)

On October 3, 2003, Melinda Wyatt, M.S., a licensed psychologist, examined Blevins. (R. at 159-66.) Blevins denied a history of psychiatric or psychological treatment. (R. at 161.) Wyatt noted that Blevins's mood was euthymic and his affect was broad. (R. at 162.) His judgment was noted to be moderately deficient. (R. at 162.) Although Wyatt found Blevins's immediate memory to be within normal limits, his recent and remote memory were deemed impaired. (R. at 162-63.) Wyatt found Blevins's insight to be limited and his concentration adequate. (R. at 163.) Wyatt administered the Wechsler Adult Intelligence Scale-III, ("WAIS-III"), on which Blevins achieved a verbal IQ score of 76, a performance IQ score of 85 and a full-scale IQ score of 78, placing him in the borderline range of intellectual functioning. (R. at 163-64.) Wyatt ruled out an anxiety disorder and Wyatt diagnosed Blevins with borderline intellectual functioning and a then-current Global Assessment of

-8-

Functioning, ("GAF"), score of 55.[8] (R. at 164.)  Wyatt indicated that Blevins did not appear able to perform detailed or complex tasks because of his level of cognitive functioning and reported inability to read or write. (R. at 165.)  Wyatt also indicated that Blevins could perform where reading and writing was not required. (R. at 165-66.)  Wyatt found it unlikely that Blevins was capable of managing funds without assistance. (R. at 165.)

On November 18, 2003, Howard Leizer, Ph.D., a state agency psychologist, completed a mental residual functional capacity assessment for Blevins.  (R. at 172-75.)  Leizer found that Blevins was not significantly limited in most areas, but moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions and to respond appropriately to changes in the work setting. (R. at 172-73.)  Leizer noted that Blevins's mental allegations were partially credible and that his moderate limitations did not preclude competitive unskilled substantial gainful activity. (R. at 175.)  These findings were affirmed by Joseph Leizer, Ph.D., another state agency psychologist, on January 22, 2004. (R. at 174.)

On September 18, 2003, Howard Leizer completed a Psychiatric Review Technique form, ("PRTF").  (R. at 185-98.)  Leizer diagnosed Blevins as suffering from mental retardation because of his borderline intellectual functioning, but he determined that a residual functional capacity assessment was necessary to properly

_____

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF of 51-60 indicates that the individual has "[m]oderate symptoms...OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

diagnose Blevins. (R. at 185, 189.) Leizer further found that Blevins held mild limitations that restricted his activities of daily living and experienced mild difficulties in maintaining social functioning. (R. at 195.) Leizer also found that Blevins had moderate limitations in maintaining concentration, persistence or pace, but had experienced no episodes of decompensation. (R. at 195.) These findings were affirmed by state agency psychologist Joseph Leizer on January 20, 2004. (R. at 185.)

On November 18, 2003, Blevins saw Dr. Richard M. Surrusco, M.D., a state agency physician, for a physical residual functional capacity assessment. (R. at 176-84.) Dr. Surrusco found that Blevins could perform light work. (R. at 177.) Dr. Surrusco further found that Blevins could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 178.) Dr. Surrusco found no manipulative, visual, communicative or environmental limitations. (R. at 179-80.) These findings were affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on January 20, 2004. (R. at 183.)

On April 20, 2004, William A. Brezinski, M.A., a licensed psychologist, conducted a psychological evaluation of Blevins. (R. at 199-224.) Brezinski reported that Blevins was cooperative, but his mood reflected significant anxiety and his judgment and insight seemed somewhat impaired. (R. at 200-01.) Brezinski administered the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), test.[9] (R. at 203-19.) Brezinski found that the test was probably valid and Blevins was able to remain persistent, although directions had to be repeated a few times. (R. at 201.) Brezinski noted that Blevins's MMPI-2 results reflected major problems with anxiety

_____

[9]The test was administered via tape recording. (R. at 201.)

and depression. (R. at 205.) Brezinski administered the WAIS-III, on which Blevins achieved a verbal IQ score of 78, a performance IQ score of 91 and a full-scale IQ score of 83. (R. at 222.) Brezinski noted that the scores of the WAIS-III were not statistically different from Blevins's earlier scores. (R. at 201.) Therefore, Brezinski diagnosed Blevins with borderline to low average intellectual abilities. (R. at 201.) Brezinski conducted a Bender Visual Motor Gestalt Test which showed no significant pathology with respect to his perceptual abilities. (R. at 201.) Brezinski found that Blevins spelled on a second-grade level, read on a third-grade level and calculated on a fourth-grade level after conducting the Wide Range Achievement Test-Third Edition, ("WRAT-3"). (R. at 202.) Brezinski diagnosed Blevins with a dysthymic disorder, moderate to moderately severe, a moderate anxiety disorder, not otherwise specified, a reading disorder and borderline to low average intellectual functioning. (R. at 220.)

On April 26, 2004, Brezinski completed a Mental Ability To Do Work-Related Activities form. (R. at 225-26.) Brezinski found that Blevins's mental impairment would slightly[10] impair his abilities to understand and remember short, simple instructions, to understand and remember detailed instructions and to interact appropriately with co-workers. (R. at 225-26.) Brezinski further found that Blevins's abilities to make judgments on simple work-related decisions, to interact appropriately with the public, to respond appropriately to work pressures in a usual work setting, to respond appropriately to changes in a routine work setting and to carry out short

---

[10]A slight impairment is defined in the assessment as "some mild limitations in this area, but the individual can generally function well." (R. at 225.)

simple instructions would be moderately[11] affected by his mental impairment. (R. at 225-26.)  Brezinski further found Blevins's abilities to carry out detailed instructions and to interact appropriately with supervisors were markedly[12] impaired. (R. at 225-26 .)  Brezinski found that Blevins was able to manage benefits in his own interest. (R. at 226.)

On February 13, 2005, Blevins presented to Bluefield Regional Medical Center with complaints of polyuria, polydipsia, hemorrhoids, sinus problems, thirst and weakness. (R. at 227-31.) An x-ray of the paranasal sinuses was normal. (R. at 232.) Blevins was diagnosed with type II diabetes mellitus. (R. at 229.)  He was conservatively treated with medication and was educated on the condition. (R. at 229-30.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005).

---

[11] A moderate impairment is defined in the assessment as "moderate limitation in this area but the individual is still able to function satisfactorily." (R. at 225.)

[12] A marked impairment is defined in the assessment as a serious limitation.  The ability to function is severely limited, but not precluded. (R. at 225.)

If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated June 13, 2005, the ALJ denied Blevins's claims. (R. at 23-33.) The ALJ found that Blevins met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 32.) The ALJ found that Blevins had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 32.) The ALJ found that the medical evidence established that Blevins had severe impairments, namely a back disorder, type II diabetes mellitus and borderline intellectual functioning, but found that Blevins did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 32.) The ALJ further found that Blevins's allegations regarding his limitations were not totally credible. (R. at 32.) The ALJ found that Blevins had the residual functional capacity to perform light work

-13-

involving only simple repetitive tasks and with no significant contact with the public. (R. at 30, 32.) Thus, the ALJ found that Blevins could not perform any of his past relevant work. (R. at 32.) Based on Blevins's age, education and work experience and the testimony of a vocational expert, the ALJ concluded that Blevins could perform jobs existing in significant numbers in the national economy, including those of a janitor, a machine feeder, an assembler, a gate guard and a hand packer. (R. at 32.) Therefore, the ALJ found that Blevins was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 32-33.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

Blevins argues that the ALJ erred by improperly weighing the medical evidence. (Plaintiff's Memorandum In Support Of Motion For Judgment On The Pleadings, ("Plaintiff's Brief"), at 6-7.) Specifically, Blevins argues that the ALJ erred by rejecting the opinions of psychologists Brezinski and Wyatt regarding Blevins's mental impairments. (Plaintiff's Brief at 6-7.) Blevins also argues that the ALJ erred by failing to properly consider the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 7.) Blevins further argues that the ALJ improperly considered the evidence that he failed to follow the prescribed treatment and rehabilitation programs. (Plaintiff's Brief at 7-9.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

-14-

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Blevins argues that the ALJ erred by rejecting the opinions of psychologists Brezinski and Wyatt. (Plaintiff's Brief at 6-7.) The ALJ adopted the major finding of Brezinski and Wyatt that Blevins suffered from borderline intellectual functioning. The ALJ stated that he would give limited weight to the reports of both Brezinski and Wyatt because there was no treating relationship with either provider. (R. at 29, 252-53 289-90.) Under 20 C.F.R. §§ 404.1527(d), 416.927(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable evidence and is not inconsistent with the other substantial evidence of record. Wyatt diagnosed Blevins with a borderline range of intellectual functioning. (R. at 164.) Wyatt stated that, psychologically, Blevins would be able to work with

-15-

restrictions. (R. at 165-66.) Wyatt indicated that Blevins would need simplified training and supervision and that he could perform simple and repetitive tasks that did not require reading or writing. (R. at 165-66.) Wyatt then stated that it appeared that Blevins's physical concerns would affect his ability as a laborer. (R. at 166.) Wyatt's prognosis of Blevins appeared to be fair with appropriate treatment. (R. at 164.)

The ALJ gave little weight to Brezinski's diagnosis because it was inconsistent with the record as a whole and because there was no treating relationship.[13] (R. at 29, 252-53, 289-90.) Brezinski diagnosed Blevins with a dysthymic disorder, moderate to moderately severe, a moderate anxiety disorder, not otherwise specified, a reading disorder and borderline to low average intellectual functioning. (R. at 220.) He found that Blevins's psychological condition would make it difficult to anticipate any return to employment. (R. at 220.) The record shows nothing to support all the claims of Brezinski. Wyatt ruled out any anxiety disorder. (R. at 164.) Leizer diagnosed Blevins as suffering from mental retardation because of his borderline intellectual functioning, but he determined that a residual functional capacity assessment was necessary to properly diagnose Blevins. (R. at 185, 189.) Blevins testified he had no history of mental illness, nor did he allege any mental impairment that contributed to his inability to work. (R. at 71-72, 101, 261.) Blevins has maintained employment with his borderline intellectual functioning throughout his life. In this case, the ALJ found that Blevins had the residual functional capacity to perform light work limited

---

[13]The ALJ noted at the hearing that he was troubled by the fact that Brezinski administered the MMPI-2 in written form given Blevins's diminished reading ability. (R. at 252-53.) However, for clarity of the record, I note that Brezinski did administer the MMPI-2 to Blevins via audiotape recording. (R. at 201.)

-16-

to simple repetitive tasks and with no significant contact with the public. (R. at 30, 32.)  In reaching this finding, I find that the ALJ properly considered the reports of Brezinski and Wyatt and that substantial evidence supports this finding.

Blevins also argues that the ALJ erred by failing to properly consider the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 7.) Based on my review of the record, I reject Blevins's argument on this issue.  The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain.  First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, at 594 (4th Cir. 1996).  Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595.  Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595.  This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. ...

-17-

*Craig*, 76 F.3d at 595.

In his decision, the ALJ noted that Blevins's allegations of disabling pain were not consistent with the medical evidence of record. (R. at 28.) As the ALJ noted, after Blevins's second surgery, Dr. Weaver indicated that there were no radicular symptoms and that Blevins should improve with time. (R. at 29, 167.) Dr. Weaver also stated that Blevins may be a candidate for a fusion, but that he could return to work February 1, 2004, or earlier. (R. at 234.) Blevins testified that he was prescribed over-the-counter medication for mild back pain and Flexeril for muscle spasms. (R. at 269-70.) The ALJ found that Blevins's allegations regarding his limitations were not totally credible. (R. at 32.) The ALJ considered the lack of medical treatment sought. (R. at 32.) The ALJ also considered Blevins's daily activities, including his ability to hunt, to take care of his own personal needs, to manage household chores, to shop and to visit with relatives and friends. (R. at 28.) Furthermore, Blevins testified that he could perform the duties of a sedentary job if he were allowed a sit/stand option. (R. at 28, 268-69.) Based on this, I find that substantial evidence exists to support the ALJ's finding on this issue.

Blevins's final argument is that the ALJ improperly considered the evidence that Blevins failed to follow the prescribed treatment and rehabilitation programs. (Plaintiff's Brief at 7-9.) Specifically, Blevins alleges that the physicians he was sent to under the Virginia workers' compensation program did nothing to help alleviate his pain and that he could not afford treatment outside of the program. Again, I disagree. Blevins's failure to follow prescribed treatment is not the primary reason the ALJ rejected his claim. The ALJ merely considered Blevins's treatment history, noting

-18-

that it was "inconsistent and intermittent" in determining that his claims of disabling pain were not supported by the evidence of the record. (R. at 28.)  Therefore, I find that substantial evidence exists to support the ALJ's findings on this issue.

Based on my review of the record, however, I do not find that substantial evidence supports the ALJ's finding that other jobs existed that Blevins could perform.  The ALJ based this finding on the testimony of a vocational expert.  To provide substantial evidence to support a finding that other jobs existed, the vocational expert's  testimony must be in response to a proper hypothetical which sets forth the claimant's residual functional capacity as found by the ALJ. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  In this case, the ALJ found that Blevins had the ability to perform light work which did not require significant contact with the public. (R. at 30, 32.)  The hypotheticals posed to the vocational expert did not include any such restriction. (R. at 291-304.)  That being the case, I find that the vocational expert's testimony does not provide substantial evidence to support the ALJ's finding on this issue.

## *IV. Conclusion*

For the foregoing reasons, Blevins's and the Commissioner's motions for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner.

An appropriate order will be entered.

DATED:     This 27th day of June 2006.


                              /s/  *Pamela Meade Sargent*
                              UNITED STATES MAGISTRATE JUDGE